UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

FILED
in the Middle District of
North Carolina

September 30, 2023
7:03 pm

Clerk, US District Court
By: _____ kg _____

| | |
|---|---|
| PAULICKIA JAZZMUN HAIRSTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRIAN K. TALLEY, in his individual | ) |
| and official capacities, JEROME | ) |
| PALMENTERI, in his individual and | ) |
| official capacities, CHIEF WAYNE | ) |
| SCOTT, in his individual and official | ) |
| capacities, CHIEF BRIAN L. JAMES, in | ) |
| his individual and official capacities and as | ) |
| successor to CHIEF WAYNE SCOTT, | ) |
| GREENSBORO POLICE | ) |
| DEPARTMENT, CITY OF | ) |
| GREENSBORO, ROBERT ENOCHS, | ) |
| in his individual and official capacities, | ) |
| AVERY CRUMP, in her individual and | ) |
| official capacities, and the STATE OF | ) |
| NORTH CAROLINA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 1:22CV500

MEMORANDUM OPINION AND ORDER[1]

This is a civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Paulickia Jazzmun

Hairston.  Plaintiff was shot in the head by Greensboro Police Department officer Brian K.

Talley while she was driving out of an apartment complex, and Plaintiff was subsequently

---

[1] On August 24, 2022, the Parties filed notice of their consent to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), acknowledging that all remaining proceedings in this matter including trial, entry of a final judgment, and ruling on post-judgment matters would come before the undersigned Magistrate Judge. [Doc. #15-1].

prosecuted for assault on a police officer. In this suit, Plaintiff brings claims against Officer Talley; Officer Jerome Palmenteri, the investigator responsible for producing a report of the incident; Chief Wayne Scott, the Chief of the Greensboro Police Department at the time of the incident; Chief Brian L. James, Defendant Scott's successor as Chief of the Greensboro Police Department; the Greensboro Police Department ("GPD"); the City of Greensboro; Robert Enochs, the Assistant District Attorney responsible for prosecuting Plaintiff; Avery Crump, the Guilford County District Attorney; and the State of North Carolina. Plaintiff brings these claims based on allegations that Defendant Talley unlawfully used excessive force, and that the Defendants subsequently conspired to prosecute Plaintiff without probable cause in order to cover up the unlawful use of force.

Pending before the Court are six Motions to Dismiss [Doc. #29, #32, #34, #36, #38, #40] filed by Defendants who move under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) to dismiss the case for lack of personal and/or subject matter jurisdiction, and for failure to state a claim upon which relief can be granted. For the reasons provided herein, the Motions to Dismiss by Defendants Talley, Palmenteri, Chief Scott, and the City of Greensboro will be denied, without prejudice to further consideration on dispositive motions after discovery, and the Motions to Dismiss by Chief James, by the Greensboro Police Department, and by the State of North Carolina, DA Crump, and ADA Enochs will be granted.

I.      FACTUAL ALLEGATIONS AND CLAIMS

Because this matter is before the Court on motions to dismiss, the Court sets out the facts as alleged by Plaintiff in the Complaint [Doc. #1].

2

Plaintiff alleges that on July 6, 2019, Plaintiff drove to the Willomore Street apartments with three friends. After they arrive, two of Plaintiff's friends were involved in a verbal dispute with residents of the apartment complex, and one of the friends was struck in the face. (Compl. ¶¶ 18-19). In response to the dispute, someone at the apartment complex placed a call to GPD dispatch complaining of a disturbance. (Compl. ¶ 20.) GPD officers Talley, Neiers, and Roscoe then went to the Willomore Street apartments to investigate the disturbance. (Compl. ¶ 20.) When officers arrived, Plaintiff and her friends were all in Plaintiff's vehicle and were leaving the complex. (Compl. ¶ 21.) As Plaintiff drove her vehicle toward the exit, one officer standing behind her car knocked on the back of the vehicle and called out for Plaintiff to stop. (Compl. ¶ 22.) Plaintiff, knowing that she "had done nothing wrong" and wanting "nothing to do with any of it," continued driving toward the exit. (Compl. ¶ 22.) Defendant Talley was standing near the exit of the complex. (Compl. ¶ 24.) Plaintiff alleges that as she drove past Defendant Talley to leave, Defendant Talley fired three shots from his service weapon into Plaintiff's vehicle from behind in order to stop her from leaving. (Compl. ¶ 25.) One of the shots entered the vehicle through the driver's side window from a rear angle, struck Plaintiff in the back of the head, went through her brain and out through her teeth, and embedded in the speedometer behind the steering wheel. (Compl. ¶ 25). As a result, Plaintiff lost control of her vehicle, which rolled through a yard and into a tree. (Compl. ¶ 36).

Plaintiff alleges that at the time of the shooting, no one in the car had threatened Defendant Talley, nor did Defendant Talley have probable cause to believe that any crime had been committed at the apartment complex. (Compl. ¶¶ 23, 29.) Furthermore, Plaintiff alleges

that no one was ever arrested or charged with any crime related to the disturbance to which the officers were responding at the time of the shooting. (Compl. ¶ 23.) Plaintiff also alleges that Defendant Talley was never in a self-defense position when he shot Plaintiff, that he was never in Plaintiff's vehicle's path, that he was never threatened by Plaintiff or anyone in her vehicle, and that even if he had stepped in front of Plaintiff's vehicle at some point, he had stepped out of the way prior to Plaintiff passing him. (Compl. ¶ 32.) Plaintiff alleges that Defendant Talley's actions in shooting Plaintiff directly violated law enforcement guidelines governing the use of lethal force and violated GPD directives which provide that officers may not fire any weapon at a moving vehicle except to counter an imminent threat of death or serious physical injury to the officer or another person. (Compl. ¶¶ 30-31).

Plaintiff further alleges that, following the shooting, Defendant Talley falsely told police investigators, including Defendant Palmenteri, that he fired his weapon through Plaintiff's front windshield because Plaintiff was attempting to run him over. (Compl. ¶ 26.) Plaintiff also alleges that Defendant Talley falsely told investigators that he fired two additional rounds from behind Plaintiff's vehicle because he was concerned for an additional officer who was approaching the scene, knowing that no such officer was actually approaching. (Compl. ¶ 34.)

Plaintiff alleges that Defendant Palmenteri was the lead investigator examining Defendant Talley's shooting of Plaintiff. (Compl. ¶ 37.) Plaintiff alleges that Defendant Palmenteri knew based on physical evidence that Defendant Talley's claim that he shot through Plaintiff's vehicle's front windshield was false, and knew that Defendant Talley's claim that he continued firing from behind the vehicle out of concern for an additional officer was

4

also false. (Compl. ¶¶ 27, 35.) Defendant Palmenteri also ordered the GPD Crash Reconstruction Team to analyze the scene, and GPD Investgator Reed produced an analysis concluding that "the crash was avoidable if Ms. Hairston would have reduced speed and not have accelerated so heavily." (Compl. ¶¶ 41-43.) Plaintiff alleges that this conclusion was "nonsensical," and that Defendant Palmenteri and the GPD knew the conclusion was unreliable because they each knew the crash was caused by Defendant Talley shooting Plaintiff and causing her to lose the ability to control the vehicle, not Plaintiff's speed. (Compl. ¶ 44.)

Plaintiff alleges that Defendant Palmenteri and the GPD relied on Investigator Reed's false conclusion in wrongfully referring and endorsing a felony charge against Plaintiff. (Compl. ¶¶ 45, 47.) Specifically, Plaintiff alleges that Defendant Palmenteri met with Defendant ADA Enochs at the Guilford County District Attorney's office, and Defendant Palmenteri endorsed a charge of felony assault on a police officer against Plaintiff for trying to deliberately strike Defendant Talley with her vehicle. (Compl. ¶ 40.) Plaintiff alleges that at the time, Defendant Palmenteri and the GPD knew that when Defendant Talley arrived at the apartment complex on July 6, no evidence existed that supported probable cause to arrest anyone; that Plaintiff had driven her car past Defendant Talley when Defendant Talley shot her; that Defendant Talley was not in a self-defense position when he shot Plaintiff; that Defendant Talley's statements that he fired through the front windshield and that he continued firing to protect another officer were false; that Defendant Talley had no right to shoot into Plaintiff's vehicle; and that the body-worn camera footage of the event showed that Defendant Talley was not acting in self defense when he shot Plaintiff. (Compl. ¶ 40(a-l).) Plaintiff alleges that Defendant Palmenteri and the GPD referred and endorsed the criminal charge against

Plaintiff in order to protect Defendant Talley from fault and potential legal liability, and that this venture constituted an unlawful conspiracy to deprive Plaintiff of her constitutional rights. (Compl. ¶¶ 52, 60.)

Additionally, Plaintiff alleges that the GPD and Defendant Palmenteri commenced their conspiracy to cover up Defendant Talley's wrongdoing by having Plaintiff handcuffed to her hospital bed and posting an officer at the hospital while Plaintiff was recovering from her injuries. (Compl. ¶ 48.)

Plaintiff alleges that following the meeting with Defendant Palmenteri, Defendants ADA Enochs and DA Crump accepted the referral and charged Plaintiff with felony assault on a police officer. (Compl. ¶ 49.) Specifically, Plaintiff alleges that Defendant ADA Enochs, acting in his capacity as an Assistant District Attorney employed by the State of North Carolina, wrongfully filed and pursued the felony charge, and that Defendant DA Crump, as the District Attorney, approved of and authorized the prosecution. (Compl. ¶ 53.) Plaintiff further alleges that Defendants DA Crump and ADA Enochs "knew or should have known" that Defendant Talley was not entitled to use lethal force against Plaintiff, that Defendant Talley gave false statements to investigators, and that there was no probable cause to charge Plaintiff. (Compl. ¶ 50.) Plaintiff alleges that Defendants ADA Enochs and DA Crump were therefore parties to the conspiracy to deprive Plaintiff of her constitutional rights, and that they brought the charge against Plaintiff in an attempt to justify Defendant Talley's use of lethal force. (Compl. ¶¶ 52, 60.)

Plaintiff alleges that during her prosecution, Plaintiff's criminal defense counsel requested access to the body-worn camera footage from Defendants ADA Enochs and DA

6

Crump but was denied. (Compl. ¶ 54.) Plaintiff alleges that Defendants ADA Enochs, DA Crump, and the GPD refused access to the footage because the footage shows that Defendant Talley was not entitled to use lethal force when he shot Plaintiff, and that there was no probable cause for prosecuting Plaintiff for felony assault on a police officer. (Compl. ¶ 54.) Defense counsel subsequently filed a motion to compel the production of the footage, at which point Defendants ADA Enochs and DA Crump elected to dismiss the charge against Plaintiff. (Compl. ¶ 55.) Defense counsel then filed a Petition for Release of Custodial Law Enforcement Agency Recording to obtain the footage. (Compl. ¶ 56.) In response, Defendants ADA Enochs and DA Crump allowed defense counsel to view the footage. (Compl. ¶ 57.) However, Plaintiff alleges that Defendants ADA Enochs, DA Crump, and the GPD have declined to allow copies to be made and have refused to further produce the actual footage. (Compl. ¶ 57.)

With respect to GPD and Defendant Chief Scott as then-Chief of Police, and Defendant Chief James as his successor, Plaintiff alleges that they directed, encouraged, allowed, or ratified customs, policies, or practices, or otherwise failed to train officers against tolerating the use of excessive and/or unjustified force; allowing officers to shoot into vehicles that are passing or have passed them, covering up instances of unlawful use of excessive force through self-serving investigations intended to blame victims and protect officers; and pursuing baseless criminal charges against victims in order to exonerate officers who use excessive force. (Compl. ¶¶ 90-91.) Furthermore, Plaintiff alleges with respect to District Attorney Crump and the State of North Carolina that they directed, encouraged, allowed, or ratified customs, policies, or practices, or otherwise failed to train prosecutors and staff against

instituting prosecutions without probable cause; initiating prosecutions in order to protect police officers who may have used excessive force; withholding exonerating evidence; failing to review all evidence relating to an incident including body-worn camera footage before bringing charges; dismissing charges in order to avoid providing body-worn camera footage; endorsing prosecutions without conducting an independent investigation of the incident in question; and failing to hold prosecutors accountable for initiating improper prosecutions. (Compl. ¶¶ 92-93.)

Plaintiff alleges that as a result of Defendants Talley, Palmenteri, Chief Scott, Chief James, and the GPD's actions, Plaintiff suffered severe, disabling, and deforming injuries to her face, mandible, orbit, brain, and other parts of her body that required extensive medical treatment, as well as disabling emotional injuries including post-traumatic stress disorder ("PTSD"). Plaintiff also alleges that she incurred and will continue to incur medical expenses and lost wages, has sustained permanent injuries and scarring, and has experienced and will continue to experience severe emotional distress, pain, and suffering. (Compl. ¶ 58.) In addition, Plaintiff alleges that Defendants ADA Enochs, DA Crump, and the State of North Carolina's actions perpetuated these wrongs and additionally caused Plaintiff severe emotional distress as a result of being wrongfully prosecuted, worsened the existing severe emotional distress from enduring the excessive use of force, and barred her from obtaining exonerating evidence in her criminal case. (Compl. ¶ 59.)

In the Complaint, Plaintiff alleges nine counts. First, Plaintiff asserts a claim under 42 U.S.C. § 1983 against all Defendants. This count alleges that Defendant Talley used excessive force against Plaintiff in violation of her Fourth Amendment rights, that Defendant Palmenteri

8

and the GPD commenced a malicious prosecution of Plaintiff, and that all other Defendants joined in that effort in order to protect Defendant Talley from consequences for his actions. (Compl. ¶¶ 72-74, 79.) Second, Plaintiff asserts supervisory and municipal liability claims under 42 U.S.C. § 1983 against Defendants Chief Scott, Chief James, and DA Crump in their individual capacities, and against Defendants GPD, City of Greensboro, State of North Carolina, and Chief Scott, Chief James, and DA Crump in their official capacities. (Compl. ¶¶ 90-96.) Third, Plaintiff asserts a claim under the North Carolina State Constitution against all Defendants for violating her state constitutional rights as provided in the "Law of the Land" provision. (Compl. ¶¶ 99-103 at p. 29.)[2] Fourth, Plaintiff asserts a claim for assault and battery against Defendants Talley, GPD, City of Greensboro, Chief Scott, and Chief James. (Compl. ¶¶ 104-110 at pp. 29-30.) Fifth, Plaintiff asserts claims for negligence and gross negligence against Defendants Talley, GPD, City of Greensboro, Palmenteri, Chief Scott, and Chief James, in the alternative to her state intentional tort claims. (Compl., ¶¶ 103-107 at pp. 31-35.) Sixth, Plaintiff asserts a false imprisonment claim against Defendants Talley, Palmenteri, GPD, City of Greensboro, Chief Scott, and Chief James. (Compl. ¶¶ 112-115.) Seventh, Plaintiff asserts a claim of intentional infliction of emotional distress against Defendants Talley, Palmenteri, Chief Scott, Chief James, GPD, and City of Greensboro. (Compl. ¶¶ 118-120). Eighth, Plaintiff asserts a claim of negligent infliction of severe emotional distress against Defendants Talley, Palmenteri, Chief Scott, Chief James, GPD, and City of Greensboro, in the alternative to her intentional infliction of emotional distress claim. (Compl. ¶¶ 124-126.)

---

[2] The Complaint includes duplicate Paragraphs 100-107, so the Court includes the page number for these sections to note the specific reference.

9

Ninth, Plaintiff alleges a claim of civil conspiracy under both 42 U.S.C. § 1983 and North Carolina state law against all Defendants, premised on the assertion that all Defendants conspired and acted in concert to protect Defendant Talley and the GPD from liability for shooting Plaintiff. (Compl. ¶¶ 130-31.)

All Defendants have moved to dismiss all claims against them for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In each of the Motions to Dismiss, Defendants contend that Plaintiff failed to state a claim upon which relief can be granted, that Plaintiff failed to plausibly allege underlying unconstitutional conduct on behalf of any individual Defendant under either the United States or North Carolina Constitutions, and further that Defendants are entitled to immunity with respect to all claims. Additionally, Defendants DA Crump, ADA Enochs, and State of North Carolina have moved to dismiss all claims for lack of personal and/or subject matter jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and (2) based on the Eleventh Amendment.

## II.    MOTION TO DISMISS STANDARD

A defendant may raise lack of jurisdiction in a motion to dismiss. Fed. R. Civ. P. 12(b)(1) and (2). The court must address questions of jurisdiction before addressing the merits of the plaintiff's claim, and claims of immunity under the Eleventh Amendment have "attributes of both subject-matter jurisdiction and personal jurisdiction." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005).

When considering a motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), the Court must consider

whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is "facially plausible" when the facts pled allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This standard "demands more than an unadorned, the-defendant-harmed-me accusation." Id. In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "the well-pleaded facts" must "permit the court to infer more than a possibility of misconduct." Id. at 679. The court must "draw on its judicial experience and common sense" to determine whether the facts "plausibly give rise to an entitlement of relief." Id.

III.     DISCUSSION

A.  Defendant Talley

1.  Count 1: Excessive Force and Malicious Prosecution in Violation of 42 U.S.C. § 1983

In his Motion to Dismiss, Defendant Talley first contends that Plaintiff has failed to state a claim against him under 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, Plaintiff must "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). A claim of excessive force during an investigatory stop is properly characterized as a Fourth Amendment violation of a citizen's "right 'to be secure in their persons ... against unreasonable ... seizures' of the

11

person." Graham v. Connor, 490 U.S. 386, 394-95 (1989). Therefore, any claim of excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Id.

The reasonableness of the use and degree of force under this standard "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). Though this reasonableness test "is not capable of precise definition or mechanical application," Id. (quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979)), some factors the court may consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. The application of the test must reflect "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397. However, the inquiry should be objective, that is, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id.

"Because deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." Williams v. Strickland, 917 F.3d 763, 769 (4th Cir. 2019). "Indeed, an officer may reasonably

apply deadly force to a fleeing suspect—even someone suspected of committing a serious felony—only if the officer has 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" Id. (quoting Garner, 471 U.S. at 9). Moreover, that significant threat of death or serious physical injury must be "immediate" at the time the officer uses deadly force. Id. "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005).

Applying this standard, the Fourth Circuit in Williams v. Strickland found that the use of deadly force was not justified when two police officers fired their weapons into a fleeing car from behind. 917 F.3d at 769. Even though the plaintiff in that case had attempted to strike the officers with his vehicle mere seconds prior to the shooting, the court had "no difficulty concluding" that the use of force after the threat had abated was not reasonable. Id.

Here, Plaintiff has alleged an unreasonable violation of her Fourth Amendment rights. Plaintiff alleged that Defendant Talley, acting in his capacity as an officer with the Greensboro Police Department, violated Plaintiff's Fourth Amendment right to be free from excessive force by firing three shots into her vehicle from behind as Plaintiff drove away. (Compl. ¶ 72.) The facts alleged in the Complaint describe an even less reasonable use of deadly force than was the case in Williams. Unlike the plaintiff in that case who was admittedly resisting arrest, Plaintiff here asserts that she had not committed any crime for which the officers on the scene would seek to arrest her. (Compl. ¶ 23.) Plaintiff resolved to leave the apartments so as to avoid interacting with the Greensboro police officers since she had not been involved in the disturbance. (Compl. ¶ 22.) The Complaint asserts that she simply drove past the

13

officers on her way out of the parking lot, and neither she nor any of her passengers behaved in a threatening manner in any way. (Compl. ¶¶ 22, 29.) Even if Defendant Talley had reasonably suspected that Plaintiff had attempted to assault him as she drove in his direction, based on the standards articulated in Williams, his use of force would not have been justified at the time he discharged his weapon since she had driven past him, and he was no longer facing an immediate threat. (Compl. ¶ 25.) Therefore, recalling the factors provided in Graham, the facts as alleged in the Complaint assert that Plaintiff had not committed any crime and did not present an immediate threat to Defendant Talley. In light of the Fourth Circuit's guidance in Williams, in this case Plaintiff has plausibly alleged an unreasonable use of deadly force by Defendant Talley.[3]

Defendant Talley nevertheless contends that the claims should be dismissed based on qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is meant to balance "the need to hold government officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. Questions of qualified immunity should be resolved "at the earliest possible stage in litigation." Id. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

---

[3] Of course, this analysis is based solely on the facts as alleged by Plaintiff in the Complaint. To the extent that Defendant Talley contests Plaintiff's version of events, those disputes can be considered after discovery, on dispositive motions or at trial.

14

Qualified immunity would not preclude a claim if a plaintiff pleads facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). The Fourth Circuit has explained that to determine whether a right was clearly established, the Court asks "whether, when the defendants violated the right, there existed either controlling authority (such as a published opinion of [the Fourth Circuit]) or a 'robust consensus of persuasive authority.'" Williams v. Strickland, 917 F.3d at 769. In Williams v. Strickland, the Fourth Circuit explained that

> in 2005, we clearly established that (1) law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory.

Williams, 917 F.3d at 770. Like the allegations in the present case, the shooting in Williams occurred in the parking lot of an apartment complex, and that the officer fired his weapon as or immediately after the plaintiff passed by. Id. at 766.

Defendant points to Brousseau v. Haugen, in which the Supreme Court held that where the officer shot the plaintiff from behind as he drove away following an altercation, the officer did not violate the plaintiff's clearly established rights because he posed a risk to officers and others in the vicinity. 543 U.S. 194, 196-97 (2004). However, that case involved a more fully developed record on summary judgment, and the Supreme Court noted specifically that in that case the plaintiff was a "disturbed felon" and there were "persons in the immediate area [] at risk from that flight," and the Supreme Court found that the situation "fell in the 'hazy border between excessive and acceptable force.'" Id. at 200-01 (quoting Saucier v. Katz, 533

U.S. 194, 206 (2001)). The Supreme Court specifically noted that shootings of fleeing suspects is an area "in which the result depends very much on the facts of each case." Id. at 201.

Applying this guidance to the facts asserted in Plaintiff's Complaint, it is apparent that dismissal at this stage would be inappropriate. First, the Complaint alleges sufficient facts to state a claim that Defendant Talley violated Plaintiff's Fourth Amendment rights, as described above. Second, her rights were clearly established as reflected in the specific adjudication of the Fourth Circuit in Williams. In the Complaint, Plaintiff admits that she ignored an officer's request to stop but alleges that she did not act in any threatening manner during the incident. (Compl. ¶¶ 22, 29.) Furthermore, Plaintiff alleges that she had driven past Defendant Talley by the time he discharged his weapon. (Compl. ¶ 25.) According to the allegations in the Complaint, Defendant Talley shot into the car through the driver's side window at a rear angle, sending the bullet through Plaintiff's head from behind and into the vehicle's speedometer. (Compl. ¶ 25.) Defendant Talley's assertions that Plaintiff was driving recklessly and that there were other officers in the vicinity, as was the case in Brousseau, raise factual disputes beyond the scope of a motion to dismiss. On a motion to dismiss, the Court must take the facts as alleged in the Complaint, so considering Defendant Talley's alternative depiction of the facts would be inappropriate at this stage. Since the facts as alleged in the Complaint depict a situation where Plaintiff's constitutional rights were clearly established, Defendant Talley's motion to dismiss the excessive force claim based on qualified immunity is denied.

   2.   Other Claims

Plaintiff has similarly stated plausible claims for her state law claims of assault and battery, false imprisonment, gross negligence, and negligent and intentional infliction of

emotional distress, based on the same factual assertions supporting the § 1983 claim for excessive force by Defendant Talley. [4]

Defendants argue that Plaintiff's state claims are barred by public official immunity. "Public officials in North Carolina usually are immune from suit for actions taken in their official capacities." Hensley v. Price, 876 F.3d 573, 587 (4th Cir. 2017). Police officers would therefore be entitled to public official immunity "so long as they did not act (1) outside the scope of their official authority, (2) with malice, or (3) in a corrupt manner." Id. (internal quotation omitted). However, this immunity "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003).[5] For the same reasons set out above with regard to the § 1983 case, public official immunity would not provide a basis for dismissal at this stage of the case, since

---

[4] With respect to the false imprisonment claim, Plaintiff alleges that Defendant Talley intentionally provided false information to Detective Palmenteri to effect Plaintiff's detention, in order to cover up his own use of excessive force. Further consideration of the extent of Defendant Talley's involvement in the detention would be more appropriate on dispositive motions after discovery. Similarly with regard to the IIED and NIED claims, Plaintiff has alleged "disabling emotional injuries including PTSD" (Compl. ¶58), has alleged facts to support a claim of extreme and outrageous conduct as set out above with regard to the § 1983 claim, and has pointed to a Fourth Circuit case recognizing the possibility of an NIED claim in a case involving deputies' use of deadly force, see Hensley v. Price, 876 F.3d at 588, and any further consideration of these issues can be raised on dispositive motions or at trial.

[5] "Under North Carolina law, a law enforcement officer has a duty not to use deadly force upon another person unless, among other things, it is 'reasonably necessary ... [t]o defend himself or a third person from what he reasonable believes to be the use or imminent use of deadly physical force[.]'" Id. (quoting N.C. Gen. Stat. § 15A-401(d)(1)–(d)(2)). That statute further provides that "[n]othing in this subdivision . . . shall [] be construed to excuse of justify the use of unreasonable or excessive force." N.C. Gen. Stat. § 15A-401(d)(2). Defendant contends that this statute would provide protection from liability, while Plaintiff notes that this statute sets out Defendant's duty and a basis for liability. As discussed above with regard to the § 1983 claim, Plaintiff has alleged that Officer Talley's use of deadly force was not necessary to defend himself or another person from the imminent use of deadly physical force, and was unreasonable and excessive force. Any disputes regarding those contentions would be beyond the scope of a motion to dismiss.

Plaintiff plausibly alleged that Defendant Talley's use of deadly force was not reasonably necessary and violated plaintiff's clearly established rights. Cf. Hensley v. Price, 876 F.3d at 588 ("[W]e conclude that the district court appropriately denied the Deputies qualified immunity on the plaintiffs' § 1983 claim and state law assault claim, as well as public official immunity on their NIED, wrongful death and punitive damages claims brought under North Carolina law."). Therefore, the Motion to Dismiss these state law claims will be denied at this stage of the case. [6]

Finally, the Court notes that Plaintiff has asserted a claim for civil conspiracy under § 1983 and state law. To plead a civil conspiracy claim under § 1983, the plaintiff must "present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). In the Motion to Dismiss, Defendant Talley contends that the intracorporate conspiracy doctrine applies here and "bars claims based on an alleged conspiracy among a corporation [or municipality] and its officers, employees, and agents." Fox v. City of Greensboro, 807 F. Supp. 2d 476, 499 (M.D.N.C. 2011). Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." Ziglar v. Abbasi, 582 U.S. 120, 153 (2017).

---

[6] With respect to Plaintiff's negligence claims, Defendant also argues that the public duty doctrine applies to preclude those claims. However, it is not clear how the public duty doctrine would apply here, as Plaintiff does not base her claims on an alleged failure to act, but rather specific conduct directed towards her. To the extent Plaintiff may have brought any of her state law claims based on simple negligence, without malice, it appears that public official immunity could bar those claims, but any remaining disputes as to the viability of any state law claims can be further addressed on dispositive motions after discovery.

"Merely suing the officers, employees, or agents in their individual capacities does not change the result." Fox, 807 F. Supp. 2d at 499.

However, in Ziglar, the Supreme Court noted a lack of consensus among the circuit courts in the application of this doctrine to alleged constitutional violations, and noted that "[t]hese considerations suggest that officials employed by the same governmental department do not conspire when they speak to one another and work together in their official capacities," but "[w]hether that contention should prevail need not be decided" and remains an open question. Ziglar, 582 U.S. 120, 155 (2017).

Moreover, immunity can be destroyed if an agent is performing an *unauthorized* act in furtherance of a conspiracy. Buschi v. Kirven, 775 F.2d 1240, 1251-52 (4th Cir. 1985) (finding exception to the intracorporate conspiracy doctrine "where the plaintiff has alleged that the corporate employees were dominated by personal motives or where their actions exceeded the bounds of their authority."); see also Greenville Pub. Co. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir. 1974) ("We agree with the general rule [that a corporation cannot be guilty of conspiring with its officers or agents] but think an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective."); Heyward v. Tyner, No. 2:17-01545-DCN, 2018 WL 1391334 (D.S.C. March 20, 2018) ("Heyward sufficiently alleges that Powell and Tyner purposefully filed false police reports regarding the shooting in order to make Heyward appear as if he were a threat and that the other moving defendants made false statements to substantiate this narrative. Therefore, the court declines to apply the intracorporate conspiracy doctrine and refrains from dismissing Heyward's conspiracy claim." (internal citation omitted)).

19

Thus, it is not clear that the intracorporate conspiracy doctrine would apply here. In any event, individuals are liable for their own conduct under § 1983, with specific provisions for bystander liability and supervisor liability. As noted by the Supreme Court, to adequately state a claim under § 1983, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). Here, to the extent Plaintiff alleges that Defendant Talley participated in the alleged constitutional violations and state law violations, those claims are going forward under the substantive counts discussed above, and the conspiracy claim does materially change or add to the claims. Therefore, the Court need not resolve this issue further at this time. If there is some additional basis for further consideration of the conspiracy claims after discovery, those issues can be raised for further consideration at that time.

Therefore, Defendant Talley's Motion to Dismiss [Doc. #34] will be denied. However, Defendant Talley notes that the claims against him in his official capacity are duplicative of the claims asserted against the City of Greensboro, and also notes that any claims for violation of the North Carolina Constitution could not be asserted against him in his individual capacity. For clarity going forward, the official capacity claims against Defendant Talley will be considered and addressed as claims against the City of Greensboro.[7]

---

[7] Suits against government employees in their official capacity under § 1983 "generally represent only another way of pleading an action against an entity of which an officer is an agent." Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978). Therefore, where a plaintiff asserts claims against both individuals in their official capacity and the entity of which they are an employee or agent, the Court may dismiss the official capacity claims as duplicative or redundant. See e.g. Fields v. Tucker, 2011 WL 4345306, at *2-3, Hadley v. City of Mebane, 2020 WL 1539724, at *7.

B. Defendant Palmenteri

    1. Count 1: Excessive Force and Unlawful Prosecution in Violation of 42 U.S.C. § 1983

Defendant Palmenteri similarly moves to dismiss the claims asserted against him under § 1983. Plaintiff alleges a § 1983 claim against Defendant Palmenteri based on alleged violation of Plaintiff's Fourth Amendment right to be free from malicious prosecution. As the Supreme Court has recognized:

> "[A] Fourth Amendment claim under § 1983 for malicious prosecution [is] sometimes referred to as a claim for unreasonable seizure pursuant to legal process. This Court's precedents recognize such a claim. See Manuel v. Joliet, 580 U.S. 357, 363–364, 367–368, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017); Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion); see also id., at 290–291, 114 S.Ct. 807 (Souter, J., concurring in judgment). And following this Court's precedents, the District Courts and Courts of Appeals have decided numerous cases involving Fourth Amendment claims under § 1983 for malicious prosecution. See, e.g., Pitt v. District of Columbia, 491 F.3d 494, 510–511 (CADC 2007) ("[N]early every other Circuit has held that malicious prosecution is actionable under the Fourth Amendment to the extent that the defendant's actions cause the plaintiff to be 'seized' without probable cause"); Kossler, 564 F.3d at 186–187; Sykes v. Anderson, 625 F.3d 294, 308–309 (CA6 2010); Durham v. Horner, 690 F.3d 183, 188 (CA4 2012); Myers v. Koopman, 738 F.3d 1190, 1194 (CA10 2013); Winfrey v. Rogers, 901 F.3d 483, 491–493 (CA5 2018); Lanning, 908 F.3d at 28; Jordan v. Waldoboro, 943 F.3d 532, 545 (CA1 2019); Williams v. Aguirre, 965 F.3d 1147, 1157 (CA11 2020).
>
> . . .  To determine the elements of a constitutional claim under § 1983, this Court's practice is to first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted, so long as doing so is consistent with "the values and purposes of the constitutional right at issue." Manuel, 580 U.S., at 370, 137 S.Ct. 911; see also Nieves v. Bartlett, 587 U.S. ——, ——, 139 S.Ct. 1715, 1726, 204 L.Ed.2d 1 (2019); Heck, 512 U.S. at 483, 114 S.Ct. 2364.
>
> Here, as most of the Courts of Appeals to consider the question have determined, the most analogous tort to this Fourth Amendment claim is malicious prosecution. See Kossler, 564 F.3d at 186; Sykes, 625 F.3d at 308–309; Durham, 690 F.3d at 188; Myers, 738 F.3d at 1194; Lanning, 908 F.3d at 28; Jordan, 943 F.3d at 545. **That is because the gravamen of the Fourth**

21

**Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution.**

In American courts as of 1871, the malicious prosecution tort generally allowed recovery against an individual who had initiated or caused the initiation of criminal proceedings despite having "no good reason to believe" that criminal charges were "justified by the facts and the law." T. Cooley, <u>Law of Torts</u> 180 (1880) (Cooley); <u>see also</u> 1 F. Hilliard, <u>The Law of Torts or Private Wrongs</u> 412–414 (1866) (Hilliard). The malicious prosecution tort protected against "injury to the person, as connected with false imprisonment" and against "a wrong to character or reputation." <u>Id.</u>, at 412 (emphasis deleted).

**American courts described the elements of the malicious prosecution tort as follows: (i) the suit or proceeding was "instituted without any probable cause"; (ii) the "motive in instituting" the suit "was malicious," which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution "terminated in the acquittal or discharge of the accused."** Cooley 181.3

<u>Thompson v. Clark</u>, 142 S. Ct. 1332 (2022).

The Fourth Circuit has historically adopted similar requirements for such a claim, noting that, "a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." <u>Evans v. Chalmers</u>, 703 F.3d 636, 647 (4th Cir. 2012). Where the seizure is based on an indictment and the prosecutor retains all discretion to seek an indictment, "police officers may be held to have caused the seizure and remain liable to a wrongfully indicted defendant under certain circumstances" such as "when they have lied to or misled the prosecutor." <u>Id.</u> ("Stated differently, a police officer is not liable for a plaintiff's unlawful seizure following indictment in the absence of evidence that [the officer] misled or pressured the prosecution." (internal quotation omitted)). In that scenario, a plaintiff must

22

show that the officer "deliberately or with a 'reckless disregard for the truth' made material false statements in his affidavit, or omitted from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." Miller v. Prince George's County, MD, 475 F.3d 621, 627 (4th Cir. 2007) (internal citations and quotations omitted). "'Reckless disregard' can be established by evidence that an officer acted 'with a high degree of awareness of [a statement's] probable falsity,' that is, 'when viewing all the evidence, the affiant must have entertained serious doubts as to the … accuracy of the information he reported.'" Id. (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)). For the false statements or omissions to be material, they must be "'necessary to the [neutral and disinterested magistrate's] finding of probable cause.'" Id. at 628 (quoting Franks, 438 U.S. at 155-56). "To determine materiality, a court must 'excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.'" Id. (quoting Wilson, 212 F.3d at 789). "If the 'corrected' warrant affidavit establishes probable cause, no civil liability lies against the officer." Id.

Here, Plaintiff has plausibly alleged that Defendant Palmenteri violated Plaintiff's Fourth Amendment rights by bringing false charges without probable cause resulting in her detention in the hospital, and by making material false statements to the Guilford County District Attorney's Office while referring and endorsing a felony charge of assault on a police officer under N.C.G.S. § 14-34.2. Plaintiff alleges that Defendant Palmenteri knew that Defendant Talley had shot Plaintiff from the back after she drove past him, knew that Defendant Talley was not in a self-defense position, knew that Defendant Talley falsely

asserted that he fired through the front of the windshield when the evidence showed otherwise, knew that Defendant Talley was falsely reporting that he fired additional shots to protect another officer, and knew that body worn camera footage showed that Defendant Talley was not acting in self defense and had no right to shoot Plaintiff. Plaintiff specifically alleges that Palmenteri materially misrepresented the events of July 6, 2019 in order to cover up the illegal shooting and protect Defendant Talley and the GPD. Plaintiff contends that based on a materially false representation of events, Defendant Palmentari brought charges resulting in Plaintiff's detention at the hospital.[8] Plaintiff further alleges that in investigating the shooting, Defendant Palmenteri obtained an inaccurate crash reconstruction analysis knowing that the conclusions were unreliable, and subsequently made representations regarding the incident to the Guilford County District Attorney and recommended that the District Attorney endorse charges against Plaintiff for felony assault on a police officer, knowing that there was not probable cause to support the charges. Those charges were later dismissed after the body worn camera footage was disclosed, thus terminating in Plaintiff's favor. To the extent Defendant raises contentions regarding the materiality of Defendant Palmenteri's statements, or the extent to which Defendant Palmenteri was actually involved in the detention and subsequent prosecution of Plaintiff, those issues are more appropriate for further consideration on a complete record after discovery.

Furthermore, as alleged, the claim is not barred by qualified immunity. "[Q]ualified immunity does not protect an officer who seeks a warrant on the basis of an affidavit that a

---

[8] In the briefing, Plaintiff further notes that documents subsequently provided by Defendants reflect that Defendant Palmenteri instituted the charges by making materially false representations regarding the incident to a state magistrate resulting in the issuance of an arrest warrant.

reasonably well-trained officer would have known failed to demonstrate probable cause—even if the magistrate erroneously issues the warrant," and "issuance of the warrant will not shield an officer when . . . the underlying affidavit includes deliberate and reckless misstatements and omissions." Miller, 475 F.3d at 632. As noted by the Fourth Circuit in 2007, "[t]he law was unquestionably clearly established at the time of the events at issue here" and officers had "fair warning" that "the Constitution did not permit a police officer deliberately, or with reckless disregard for the truth, to make material misrepresentations or omissions to seek a warrant that would otherwise be without probable cause." Id. Indeed "[n]o reasonable police officer . . . could believe that the Fourth Amendment permitted such conduct." Id.; see also Hupp v. Cook, 931 F.3d 307, 318 (4th Cir. 2019) ("Likewise, where an officer provides misleading information to the prosecuting attorney or where probable cause is plainly lacking, the procedural steps taken by an officer no longer afford a shield against a Fourth Amendment claim." (internal quotation omitted)). Willfully or recklessly misleading the prosecuting attorney and the magistrate, as Plaintiff alleges Defendant Palmenteri has done, violates Plaintiff's plainly established constitutional right to be prosecuted only upon probable cause, and qualified immunity does not bar the claim. Defendant Palmenteri's motion to dismiss Plaintiff's § 1983 claim will be denied.

### 2. Other Claims

For the same reasons set out above with regard to the § 1983 claims, Plaintiff has plausibly alleged her state law claims against Defendant Palmenteri for gross negligence, false imprisonment, and intentional and negligent infliction of emotional distress. To the extent to which Defendants dispute the extent to which Defendant Palmenteri instigated, caused, or

participated in Plaintiff's detention at the hospital or subsequent prosecution by the District Attorney's Office, those are issues that can be addressed on dispositive motions after a period of discovery. In addition, as discussed above as to Defendant Talley, public official immunity "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). Therefore, public official immunity does not bar those state law claims at this stage based on the claims as alleged. Finally, to the extent Defendant seeks dismissal of the conspiracy claim, the same analysis set out above as to Defendant Talley would apply.[9]

Therefore, Defendant Palmenteri's Motion to Dismiss [Doc. #38] will be denied. However, as with Defendant Talley, the claims against Defendant Palmenteri in his official capacity are duplicative of the claims asserted against the City of Greensboro, and Defendant Palmenteri similarly notes that any claims for violation of the North Carolina Constitution could not be asserted against him in his individual capacity. For clarity going forward, the official capacity claims against Defendant Palmenteri will be considered and addressed as claims against the City of Greensboro.

C. Defendant City of Greensboro

1. Count 2: Municipal Liability in Violation of 42 U.S.C. § 1983

Defendant City of Greensboro moves to dismiss the municipal liability claims asserted by Plaintiff under § 1983. Under § 1983, municipal liability is limited to action for which the

_____

[9] Defendant Palmenteri, who is represented by the same counsel as Defendant Talley, raises many of the same issues considered and addressed as to Defendant Talley, and the same analysis would apply.

municipality is "actually responsible." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986).

Municipal liability applies to local government entities when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>Monell v. N.Y.C. Dep't of Soc. Svcs.</u>, 436 U.S. 658, 690 (1978). A municipality may not be held liable under § 1983 "*solely* because it employs a tortfeasor." <u>Id.</u> at 691 (emphasis in original).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

<u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999)). To state a failure-to-train claim under <u>Monell</u>, a plaintiff must plead that:

> (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to properly train the subordinates, illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights.

<u>Hines v. Johnson</u>, 2020 WL 1516397 at *6 (quoting <u>Staton v. Doe</u>, 2016 WL 6493418, at *4). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.'" <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 379 (1989). With respect to custom or usage, "municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." <u>Spell v.</u>

McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987). Constructive knowledge "may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." Id. Causation, in this context, can be found where "occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." Id.

Here, Plaintiff contends that GPD failed to properly train officers in a way that illustrates deliberate indifference to the rights of the persons with whom the officers came into contact, and that by custom and practice the GPD has a widespread practice of using and tolerating the use of excessive force, including specifically a practice of allowing officers to shoot into cars that have passed them, improperly investigating incidences of excessive force, including specifically prosecuting victims of excessive force to protect the officers and blame the victims, and pursuing malicious prosecutions of victims of excessive force in order to protect the officer and blame the victim. (Compl. ¶ 90.)

In response, Defendant City disputes the factual circumstances alleged in the Complaint, arguing as an initial matter that Plaintiff has not alleged facts that would show a violation of her constitutional rights. However, for the reasons set out above as to Defendant Talley and Defendant Palmenteri, Plaintiff has plausibly alleged her § 1983 claims, and Defendant's factual disputes are beyond the scope of a motion to dismiss.

Defendant also argues that Plaintiff's Monell allegations are conclusory, and the Plaintiff would need to establish "continued inaction in the face of widespread abuses" Randall v. Prince George's Cty., 302 F.3d 188, 206 (4th Cir. 2002), to establish municipal liability under § 1983. On this point, the Court agrees that Plaintiff will need much more to establish a

28

municipal custom or policy to ultimately support a § 1983 claim. However, at this early stage in the case, given the claims that are going forward, the Court concludes that it would be premature to dismiss these <u>Monell</u> claims in their entirety.[10] Nevertheless, the Court is particularly concerned regarding burdens of discovery, and will not allow these claims to become a basis for unduly burdensome or broad-ranging discovery beyond the scope of the other specific claims in this case.

   2.   <u>Other Claims</u>

The City of Greensboro, as employer of Defendant Talley and Defendant Palmenteri, is potentially liable on the state law claims under a theory of vicarious liability or *respondeat superior*. An employer is vicariously liable for "the wrongful act or neglect of his employee if, but only if, such act or omission occurred in the course of the employment." <u>Wegner v. Delly-Land Delicatessen, Inc.</u>, 270 N.C. 62, 66 (1967). If the wrongful act occurred in the performance of an employee's duties, "the employer is not absolved from liability by reason of the fact that the employee was also motivated by malice or ill will toward the person injured, or even by the fact that the employer had expressly forbidden him to commit such act." <u>Id.</u> Here, Plaintiff has properly alleged state law claims against Defendant Talley for assault and battery, gross negligence, false imprisonment, and negligent and intentional infliction of emotional distress, and against Defendant Palmenteri for gross negligence, false imprisonment, and negligent and intentional infliction of emotional distress. As noted above,

---

[10] The Court notes that the cases cited by Defendant City in large part involved either: resolution at summary judgment or at trial on a fuller record; or cases in which all of the claims were being dismissed so that nothing else was proceeding; or cases in which at least some Monell claims were allowed to proceed along with the other § 1983 claims, so that the substance of the claims could still be addressed at summary judgment or trial.

29

the claims against Defendant Talley and Defendant Palmenteri in their official capacities and the claims under the North Carolina Constitution are all construed as claims against the City.

Defendant City contends that Plaintiff's state law claims are barred by governmental immunity. In North Carolina, "municipalities enjoy governmental immunity from state common-law tort claims arising out of their performance of governmental … functions." Evans v. Chalmers, 703 F.3d 636, 655 (4th Cir. 2012). However, government entities may waive governmental immunity by (1) purchasing liability insurance which indemnifies it from tort liability; (2) participating in a local government risk pool which indemnifies it from tort liability; or (3) enacting a resolution creating a funded reserve which indemnifies it from tort liability. N.C. Gen. Stat. § 160A-485(a).

Here, Plaintiff alleges that the City of Greensboro has enacted a waiver of governmental immunity by purchase of liability insurance, entry into a governmental risk pool that waived immunity, and enactment of a resolution waiving immunity as to these claims. (Compl. ¶ 17.) Defendant City provided an affidavit averring that the City of Greensboro has not purchased a primary general liability policy, does not participate in a local government risk pool, and participates in a self-funded Local Government Excess Liability Fund which does not indemnify Defendant against the claim. (Def. Br. [Doc. #33] Ex. A.) In Response, Plaintiff contends that the Defendant City failed to address whether it had an excess liability policy that would provide coverage and waive immunity. In Reply on that point, Defendant City argues that because Plaintiff has not specifically alleged that Defendant City purchased an excess liability policy, she has failed to plausibly allege that Defendant City has waived its immunity. (Def. Reply [Doc. #53] at 8.) However, Plaintiff did not allege that Defendant

City purchased a primary general liability policy only, but rather simply alleged that the City purchased liability insurance, which would include a primary or excess liability policy. (Compl. ¶ 17.) The Court also notes that in its Reply, Defendant City now contends that the Court should consider only the pleadings and should disregard the affidavits. (Def. Reply [Doc. #53] at 8.) At this point, it appears that there is a dispute regarding the potential waiver of immunity, and the Court does not have sufficient information or clear argument from Defendant City to fully address this contention at this point. Therefore, the Court will reserve further determination on this issue and will consider the issue of governmental immunity and potential waiver of immunity on dispositive motions after discovery.

Finally, the Court notes that Defendant City contends that Plaintiff's claims under the North Carolina Constitution should be dismissed because Plaintiff has an adequate remedy under state law. However, Plaintiff argues that dismissal would be premature, particularly given the possibility of governmental immunity by Defendant City and claims of public official immunity as to Defendants Talley and Palmenteri. See Craig v. New Hanover County Bd. of Ed., 363 N.C. 334 (2009) (holding that plaintiff's common law negligence claim did not provide an adequate remedy at state law because it would be defeated by governmental immunity, and that plaintiff could therefore bring his colorable claims directly under the North Carolina Constitution). At this point, given the remaining contentions of governmental and public official immunity, the Court cannot conclude that Plaintiff's claims under the North Carolina Constitution are barred by the existence of an adequate state law remedy.

Therefore, the Defendant City's Motion to Dismiss [Doc #32] will be denied without prejudice to further consideration of these issues on dispositive motions after discovery.

31

D. <u>Greensboro Police Department</u>

The Greensboro Policy Department has moved to dismiss on the basis that it is not an entity capable of being sued, and Plaintiff did not respond to or oppose that Motion to Dismiss. The capacity of government entities to sue or be sued is determined by the law of the state where the court is located. <u>See</u> Fed. R. Civ. P. 17(b)(3). There is no statute in North Carolina authorizing suit against a police department. <u>Coleman v Cooper</u>, 89 N.C. App. 188, 192 (1988), <u>see also</u> <u>Wright v. Town of Zebulon</u>, 202 N.C. App. 540, 543 (2010). A police department "is a 'component part [] of defendant City ... and as such lack[s] the capacity to be sued.'" <u>Coleman</u>, 89 N.C. App. at 192 (quoting <u>Jones v. City of Greensboro</u>, 51 N.C. App. 571, 593 (1981)).

In the absence of an authorizing statute, the Greensboro Police Department is not a legal entity with the capacity to be sued. Plaintiff makes no argument to the contrary. Moreover, as Plaintiff has brought identical claims against the City of Greensboro, the entity of which the Greensboro Police Department is a component part, Plaintiff will not be prejudiced by the dismissal of her claims against the Greensboro Police Department. Accordingly, the Motion to Dismiss all claims against the Greensboro Police Department [Doc. #36] will be granted.

E. <u>Defendant Chief Scott and Defendant Chief James</u>

Defendants Chief Scott (who was Chief of the GPD at the time of the alleged events) and Chief James (the successor Chief of the GPD) have filed a joint Motion to Dismiss. As an initial matter, the Court notes that with respect to Defendant Chief James, Plaintiff asserts, without supporting law, that Defendant Chief James is charged with all liability of Defendant

32

Chief Scott as his successor as Greensboro police chief. (Compl. ¶8.) However, liability is predicated exclusively on a defendant's own individual actions in § 1983 claims, Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009), and *respondeat superior* would impute liability on the employer in state claims (in this case, the City of Greensboro), see Rogers v. Town of Black Mountain, 224 N.C. 119, 121-22 (1944). Plaintiff points to no existing law in North Carolina which would justify holding a successor police chief liable for his predecessor's alleged misconduct. Therefore, Plaintiff has not plausibly stated claims against Defendant Chief James, and Defendant Chief James will dismissed from this litigation.

With respect to Defendant Chief Scott, Defendant contends that Plaintiff has failed to allege sufficient facts to establish supervisory liability as to Defendant Chief Scott. In claims under § 1983, liability may be found only where a "[g]overnment-official defendant, through his own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. Supervisors may be held liable for the constitutional injuries inflicted by their subordinates in cases where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor" of the injuries. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)). The Fourth Circuit has developed three elements to establish supervisory liability under § 1983:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799.

33

Here, however, Plaintiff notes in response that with respect to her 1983 claim, she asserted in Count 1 that Defendant Chief Scott appointed Defendant Palmenteri to investigate the shooting; that Defendant Chief Scott knew that Defendant Talley had shot Plaintiff from behind, not in self-defense; that Defendant Chief Scott knew that Defendant Talley was falsely claiming that he shot into the front of Plaintiff's vehicle in self defense and fired additional shots in defense of others; that Defendant Chief Scott knew the physical evidence and body worn camera footage showed that Defendant Talley was not acting in self defense or defense of others; that Defendant Chief Scott nevertheless instituted a felony prosecution against Plaintiff without probable cause and for the purpose of protecting Defendant Talley and the GPD; and that Defendant Chief Scott acted willfully, maliciously, and in bad faith. (Pl. Br. [Doc. #45] at 3-4 (citing Compl. ¶¶ 37, 40-47, 78, 79, 84).) Plaintiff also contends that Defendant Chief Scott directed and ratified these practices, including covering up use of excessive force to protect officers and blame victims, and failed to properly train officers regarding the use of lethal force in a vehicle leaving the scene. (Pl. Br. [Doc. #45] at 5 (citing Compl. ¶¶ 90, 91, 94, 95).) Thus, Plaintiff alleges that Defendant Chief Scott was directly involved in the decision to pursue prosecution of Plaintiff without probable cause based on misrepresentations that he knew to be false, all in an effort to protect Officer Talley and the GPD. Given these allegations, Plaintiff notes that she is not seeking to impose liability as to Defendant Chief Scott based solely on his role as a supervisor. To the extent Defendant Chief Scott contests these factual allegations, that will be an issue for dispositive motions after discovery. Similarly, with respect to the state law claims and the application of public official

immunity, the analysis set out above as to Defendant Talley and Defendant Palmenteri would apply, and those issues can be addressed further after discovery.[11]

Therefore, the Motion to Dismiss [Doc. #40] will be granted as to Defendant Chief James but denied as to Defendant Chief Scott. As with Defendants Talley and Palmenteri, the claims against Defendant Chief Scott in his official capacity are duplicative of the claims asserted against the City of Greensboro, and the official capacity claims against Defendant Chief Scott will be considered and addressed as claims against the City of Greensboro.

F.  State of North Carolina and DA Crump and ADA Enochs

The State of North Carolina is included as a Defendant and moves to dismiss based on the Eleventh Amendment. The Supreme Court has made clear that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court" including "when State officials are sued for damages in their official capacity." Kentucky v. Graham, 473 U.S. 159, 169 (1985). The Supreme Court has further held that in enacting § 1983, Congress did not intend to provide "a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties" and "had not intention to disturb the States' Eleventh Amendment Immunity." Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). The Supreme Court has therefore concluded that States, and state officials acting in their official capacity, are not "persons" subject to suit under § 1983. Id. at 70-71. District Attorneys and Assistant District Attorneys are state officials and

---

[11] The Court notes against that Defendant Chief Scott would not be vicariously liable for the acts of Defendant Talley or Defendant Palmenteri. Instead, Defendant Chief Scott would only be liable on the state law claims to the extent he himself participated in the alleged tortious conduct.

may assert sovereign immunity under the Eleventh Amendment when sued in their official capacity. See Nivens v. Gilchrist, 444 F.3d 237, 249 (4th Cir. 2006).

In light of this clear case law, the State of North Carolina, and DA Crump and ADA Enochs in their official capacities, are not "persons" subject to suit under § 1983, and pursuant to the Eleventh Amendment, the Court has no jurisdiction over Plaintiff's claims against the State of North Carolina and ADA Enochs and DA Crump in their official capacities.[12]

With respect to the claims against Defendants DA Crump and ADA Enochs in their individual capacities, those claims are barred by prosecutorial immunity. Prosecutors have immunity from civil suits arising out of the performance of their duties. Imbler v. Pachtman, 424 U.S. 409, 422-23 (1976). This immunity extends to both common law claims and claims brought under § 1983. Id. at 427-28. A prosecutor maintains his immunity even if Plaintiff can show he has acted maliciously or dishonestly in depriving Plaintiff of liberty. Id. As prosecutorial immunity protects "the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system," id. at 427-28, it is intended to wholly insulate prosecutors from the "constant dread of retaliation" that would exist if defendants had any opportunity to sue a prosecutor for carrying out his duty. See id. at 428.

---

[12] Thus, to the extent Plaintiff asserts a state law claim for violation of the North Carolina Constitution against the State of North Carolina and state officials in their official capacities, those claims would be barred by the Eleventh Amendment to the extent asserted in federal court. See, e.g., Dove v. Stevens, 2006 WL 8438680 (E.D.N.C. Oct. 23, 2006) ("The Court need not pass on the existence or adequacy of the alternative state law remedies available to Dove, because the Eleventh Amendment also prevents federal jurisdiction over his state constitutional law claims against the Highway Patrol—claims which, like his Section 1983 and state law tort claims, seek money damages from an arm of the state. As discussed above, the Eleventh Amendment divests federal courts of jurisdiction over such claims, regardless of the interaction of state sovereign immunity with North Carolina's Constitution. Dove's Corum claims against the Highway Patrol will thus also be dismissed."); see also Corum v. University of N.C., 330 N.C. 761, 788-89 (1992) (noting that such a claim "cannot be brought against government officials in their individual capacity, only in their official capacity.").

36

Absolute prosecutorial immunity applies to the "duties of the prosecutor as advocate for the State." Buckley v. Fitzsimmons, 509 U.S. 259, 272 (1993). A prosecutor's conduct that is "intimately associated with the judicial phase of the criminal process" is absolutely immune, but a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity" and are subject to qualified immunity only. Id. at 273. Conduct entitled to absolute immunity includes "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." Id. Thus, absolute immunity applies to professional evaluation of evidence presented by police, decisions to seek an arrest warrant, preparing and filing charging documents, participating in probable cause hearings, and presenting evidence at trial. Nero v. Mosby, 890 F.3d 106, 118 (4th Cir. 2018). On the other hand, a prosecutor enjoys only qualified immunity when he "functions as an administrator rather than as an officer of the court." Buckley, 509 U.S. at 273. These functions include giving legal advice to police during an investigation, investigating a case before a probable cause determination, and personally attesting to the truth of averments in a statement of probable cause. Nero, 890 F. 3d at 118.

Here, Plaintiff alleges that Defendants ADA Enochs and DA Crump instigated a malicious prosecution against her by charging her with felony assault on a police officer despite lacking probable cause, and approving of and authorizing that prosecution, respectively. (Compl. ¶ 53.) Even accepting these allegations as true, this conduct is firmly in the category of functions protected by absolute prosecutorial immunity. In the ordinary course, Defendant

37

ADA Enochs would have evaluated the evidence presented by Defendant Palmenteri, decided to seek an arrest warrant based on that evidence, and prepared and filed the charging documents.[13] Plaintiff alleges no facts which suggest that Defendants ADA Enochs or DA Crump ever offered legal advice or participated in the investigation, or otherwise performed any function that would not be protected by prosecutorial immunity.

Plaintiff instead asserts in her response that she is entitled to discovery regarding "the particulars of what precisely Enochs, Crump, and the police defendants did and said to each other before the prosecution was initiated." (Pl. Resp. [Doc. #44] p. 8). However, the pleading standard articulated in Iqbal demands that Plaintiff at least make factual allegations that show "more than a possibility" that Defendants DA Crump and ADA Enochs performed administrative functions prior to endorsing the charge against Plaintiff. She has not done so.[14] Moreover, subjecting prosecutors to the burdens of discovery based on the mere possibility that they acted outside of their prosecutorial function, as Plaintiff suggests, is inconsistent with the protections of absolute prosecutorial immunity.

---

[13] To the extent that Plaintiff alleges that Defendants DA Crump and ADA Enochs violated her procedural due process rights by not turning over the body-worn camera footage during the course of the prosecution, these alleged actions are also squarely within the prosecutorial function. Moreover, the due process right to disclosure of evidence is a trial right, see Brady v. Maryland, 373 U.S. 83, 87 (1963), that did not arise prior to the dismissal of the claim, and disclosure of the body-worn camera footage outside of any judicial proceeding would require a court order. N.C. Gen. Stat. § 132-1.4A(g). Therefore, it does not appear that Plaintiff has alleged a due process violation in this regard, and in any event the claims against DA Crump and ADA Enochs are barred by prosecutorial immunity.

[14] The Court also notes that Plaintiff's allegation that Defendants ADA Enochs and DA Crump "should have known" of the illegitimacy of the information from Defendant Palmenteri would not be sufficient to allege a conspiracy. A conspiracy requires that the conspirators positively or tacitly came to a mutual understanding; without alleging that Defendants DA Crump and ADA Enochs actually knew the facts that are alleged to be the factual basis of the conspiracy, Plaintiff cannot sufficiently allege that the conspiracy existed. In addition, as Defendants note, absolute prosecutorial immunity would still apply to any prosecutorial functions.

38

For all of these reasons, the Motion to Dismiss by the State of North Carolina and Defendants DA Crump and ADA Enochs [Doc. #29] will be granted.

IV.    CONCLUSION

IT IS THEREFORE ORDERED that the Motion to Dismiss [Doc. #34] as to Defendant Talley is denied; that the Motion to Dismiss [Doc. #38] as to Defendant Palmenteri is denied; and that the Motion to Dismiss [Doc. #32] as to Defendant City of Greensboro is denied; but the claims against Defendant Talley and Defendant Palmenteri in their official capacity are duplicative of the claims asserted against the City of Greensboro, and those claims will be considered and addressed as claims against the City of Greensboro.

IT IS FURTHER ORDERED that the Motion to Dismiss by Defendants Chief Scott and Chief James [Doc. #40] is granted as to Chief James and denied as to Chief Scott, that Chief James is dismissed from the case, and that the official capacity claims against Defendant Chief Scott will be considered and addressed as claims against the City of Greensboro.

FINALLY, IT IS ORDERED that the Motion to Dismiss by the State of North Carolina, ADA Enochs, and DA Crump [Docs. #29] is granted, that the Motion to Dismiss by the Greensboro Police Department [Doc. #36] is granted, and that the Greensboro Police Department, the State of North Carolina, DA Crump, and ADA Enochs are dismissed from the case.

This, the 30th day of September, 2023.

                                    /s/ Joi Elizabeth Peake
                                    United States Magistrate Judge